FILED

2005 Jan-20  AM 08:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**MELANIE HUBKA**,

     **Plaintiff,**

**v.**                                          **CV 04-J-0667-S**

**BOARD OF TRUSTEES OF THE
UNIVERSITY OF ALABAMA, THE
UNIVERSITY OF ALABAMA HEALTH
SERVICES FOUNDATION, P. C. AND DR.
DAVID CHESTNUT, INDIVIDUALLY,
DAWN  BULGARELLA, INDIVIDUALLY,**

     **Defendants,**

## MEMORANDUM OPINION

This cause comes before the court on motions for summary judgment filed by the defendant, Board of Trustees of the University of Alabama ("UAB"), (doc. 19) and the defendants, the University of Alabama Health Services Foundation ("UAHSF"), Dr. David Chestnut and Dawn Bulgarella (doc. 21).  The plaintiff filed a consolidated response in opposition to these motions (doc. 28).  Having considered the defendants' motions, briefs and evidentiary submissions, the plaintiff's response and the pleadings filed to date,[1]  the court finds as follows:

---

[1]Based on the plaintiff's response, the court finds that additional reply briefs by defendants will not alter this ruling.

## I.  Procedural Background

The plaintiff filed suit against defendants Chestnut and Bulgarella pursuant to 42 U.S.C. § 1983 for sex and gender discrimination under the Fifth and Fourteenth Amendments to the Constitution of the United States.  Amended Complaint ¶ 15.  Plaintiff claims that Chestnut and Bulgarella discriminated against plaintiff on the basis of sex and/or gender by terminating her employment, or by failing to take steps to prevent the termination of plaintiff's employment.  Amended Complaint ¶ 16.  Plaintiff has also claimed that Chestnut and Bulgarella discriminated against plaintiff on the basis of her disability in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.  Amended Complaint ¶¶18-19.

Additionally, plaintiff has filed a claim against the defendant UAB and the defendant UAHSF under Title VII, 42 U.S.C. §2000e *et seq.*, for sex and gender discrimination.  Plaintiff claims that by terminating her employment with said defendants rather than that of the higher paid similarly situated male employee, said defendants discriminated against plaintiff based on her sex and gender.  Amended Complaint ¶¶ 21-22.  Finally, plaintiff claims that defendants UAB and UAHSF violated the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*,

and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* by terminating her employment because of her disability.  Amended Complaint ¶¶ 24-27.[2]

## II.  Factual Background

Defendants hired plaintiff as a Financial Officer III in the fiscal affairs office of the Department of Anesthesiology beginning June 11, 1997.  Plaintiff depo. 70; Exh. 1, Exh. 12 to Plaintiff depo.  Initially, her supervisor was Greg Green. Plaintiff depo. 69-70.  Defendant Dawn Bulgarella replaced Green as the Executive Administrator for the Department of Anesthesiology in June of 1999.  Bulgarella depo. 7; Plaintiff depo. 98.  Bulgarella supervised plaintiff for three and one-half years.  Bulgarella aff., ¶ 2.

In 2002, plaintiff began having problems that impacted her work.  According to plaintiff, she was abusing Effexor, Zoloft, Lortab, Percocet, and Xanax, as well as alcohol, and "was under the influence of drugs most of the time," both at work and at home.  Plaintiff depo. 90.  As a result, she was in a "fog" and does not have much recollection of her work during that time.  Plaintiff depo. 85-86.  She admits that she was not carrying her fair share of the workload, and that there were probably a lot of things she did not do well, that she was not doing her job, and that

---

[2]Plaintiff also alleges that UAB's and UAHSF's conduct violated the Rehabilitation Act of 1973. Amended Complaint ¶ 27.  UAHSF is not a "program or activity receiving federal financial assistance" and therefore not subject to suit under the Rehabilitation Act. 29 U.S.C. § 794(a). Joint Brief of UAHSF, Chestnut and Bulgarella at 1.

a lot of her work was done by others or simply did not get done.  Plaintiff depo. 93-94, 99, 112.

In her last year of employment, plaintiff was unreliable.  Bulgarella aff., ¶ 2. Her attendance was erratic and when she was at work, she was not always productive.  Bulgarella aff., ¶ 2.  During a critical budget phase, she simply left town, went to the beach, and made no arrangements to get her work done.  Plaintiff depo. 141-42; Bulgarella aff., ¶ 2.  Faculty members reported to Bulgarella that plaintiff's behavior at a meeting was "confused and overtly juvenile."  Exh. 4 to plaintiff depo.  Although she was not getting her regular work done, she was taking on outside projects, and not completing those.  Bulgarella aff., ¶ 12; Plaintiff depo. 155-57.  Bulgarella noticed plaintiff's performance problems and addressed them with her.  Bulgarella aff., ¶ 3; Plaintiff depo. 114-115, 146; Exh. 4, Exh. 6, Exh. 7 to plaintiff depo.  Plaintiff lied to Bulgarella about the reasons for her performance decline.[3]  Plaintiff depo. 146, 150.  Plaintiff's performance continued to be erratic and, over the course of 2002, more and more of plaintiff's duties were being performed by her subordinates or, in some cases, Bulgarella.  Bulgarella aff., ¶ 3, 14; Plaintiff depo. 94, 154, Exh. 4 to plaintiff depo.

In December 2002, while at the Department holiday party, plaintiff was intoxicated and caused a scene.  Plaintiff depo. 163-64.  Her subordinates felt she

---

[3]Plaintiff told Bulgarella that she was having marital problems (which resulted in her divorce in the summer of 2002) and problems involving her son.  Bulgarella aff., ¶3.

was so impaired that they took her keys away from her and drove her home.  Exh.
2, Exh 4 to Bulgarella depo.; Plaintiff depo. 163-64.  Shortly thereafter, a number
of employees voiced concerns about the episode.  Bulgarella depo. 30-31.
Bulgarella and Marty Box, UAHSF's Human Resources Director, met with
plaintiff and encouraged her to seek counseling at the employee assistance program
("EAP").  Exh. 2 to Bulgarella depo.; Plaintiff depo. 166.  During the meeting,
plaintiff admitted that she had been abusing alcohol and agreed to go to EAP.
Plaintiff depo. 166.  As a result, plaintiff began leave on or about December 19,
2002, and entered an in-patient treatment program.  Plaintiff depo. 181-82.

In early 2003, Bulgarella recommended that the Department eliminate the
Financial Officer III position.  Bulgarella aff., ¶ 5.  When she first transferred to
the Department in 1999, Bulgarella's time was focused on billing and collections
issues.[4]  Bulgarella aff., ¶ 7.  Before her arrival, the Department performed its own
billing and collections, and this was one of the major responsibilities of the
Executive Administrator.  Bulgarella aff., ¶ 7.

With the institution of the UAHSF Management Services Organization
("MSO") in early 1999, all departments' billing and collections functions were

---

[4]Bulgarella also had responsibilities outside of the Department.  From June until August
1999, Bulgarella divided her time evenly between Anesthesiology and her former assignment,
Primary Care.  Bulgarella aff., ¶ 6.  From August to October 1999, she spent 25% of her time in
Primary Care and her remaining time in Anesthiology.  Bulgarella aff., ¶ 6.  Beginning in
October 1999, Bulgarella worked full time for Anesthesiology.  Bulgarella aff., ¶ 6.  However,
Bulgarella again split her time (from approximately October 2000 to February 2001), when she
was Interim Chief Financial Officer for UAHSF.  Bulgarella aff., ¶ 6.

centralized.  Bulgarella aff., ¶ 7.  When Bulgarella transferred to the Department in June 1999, collections were more than $1 million behind because of various start up problems.  Bulgarella aff., ¶ 7.  Accordingly, during her first year in Anesthesiology, Bulgarella focused a large part of her time and energy on the oversight and scrutiny of the MSO's billing and collections activities.  Bulgarella aff., ¶ 7.  At her deposition, plaintiff confirmed that the change to the MSO initially increased the fiscal affairs office's workload and that she took on some additional duties to assist.  Plaintiff depo. 101-03; Bulgarella aff., ¶ 7.  Bulgarella supervised and instructed plaintiff in new, temporary financial analysis functions relating to billing.  *Id.*

After about 12 or 18 months, the MSO billing collections activities stabilized.  Bulgarella aff., ¶ 8. Therefore, Bulgarella had to do much less management and analysis of billing and collections activities and Bulgarella was freed up to handle other functions.  Bulgarella aff., ¶ 8.  At this point, however, Bulgarella became the Interim Chief Financial Officer for UAHSF and divided her time between her CFO and Department duties from October 2000 to February 2001.  Bulgarella aff., ¶ 6.

In 2000 and 2001, the fiscal affairs office had another operational change with the implementation of the Lawson Accounting software.  Bulgarella aff., ¶ 9. As had occurred with the transfer of functions to the MSO, there was an initial increase in the fiscal affairs workload.  Bulgarella aff., ¶ 9; Plaintiff depo. 106.

However, once the fiscal affairs office had completed the software implementation, Bulgarella determined they could reduce some of the routine financial functions that the fiscal affairs office had previously performed, again freeing up employees for other tasks.  Bulgarella aff., ¶ 9.

With the operational changes and her ability to devote her full time to Anesthesiology, it became increasingly apparent to Bulgarella that the fiscal affairs office was overstaffed.  Bulgarella aff., ¶ 10.  Furthermore, the Department's financial condition was far from ideal.  The Department experienced net losses of $782,146 in fiscal year 2001 and $781,597 in fiscal year 2002.  Exh. 1 to Bulgarella depo., p. HSF0391; Bulgarella aff., ¶ 11.  They had budgeted a net loss of $1,541,266 for fiscal year 2003.  *Id*.  The Department anticipated an increase in demand relating to the opening of the new hospital, requiring recruitment and retention of additional faculty, which would further strain its finances.  Bulgarella aff., ¶ 11.  Accordingly, Bulgarella was looking for cost-saving opportunities. Bulgarella aff., ¶ 14.

Plaintiff was not fully occupied by her job duties.  She admits that she was not overworked.  Plaintiff depo. 125, 126.  In fact, in October 2002, plaintiff offered to work a half day a week for a former employer.  Exh. 5 to Plaintiff depo. At various times in 2002, plaintiff was taking on special projects, outside the scope of her job.  Bulgarella aff., ¶ 2.  Bulgarella recognized that plaintiff's duties were being assumed by others and she was unhappy in her assignment, so Bulgarella

7

encouraged her to apply for positions outside of the Department.  Bulgarella aff., ¶ 13; Bulgarella depo. 64; Chestnut depo. 20; *see* Exh. 2 to Plaintiff depo.  Chestnut and Bulgarella had discussed that they would probably not replace plaintiff if she obtained a position elsewhere.  Chestnut depo. 20; Bulgarella aff., ¶ 15.  All of this occurred before plaintiff disclosed any drug or alcohol abuse to defendants.

While plaintiff was on leave in December 2002 and early 2003, her coworkers continued to perform her duties.  Bulgarella aff., ¶ 14.  Thus, lower paid employees were successfully accomplishing plaintiff's duties, and Bulgarella realized that they had been for several months.  Bulgarella aff., ¶ 14.  Bulgarella herself absorbed any higher end duties.  Bulgarella aff., ¶ 14; Plaintiff depo. 183-84.  Given the decline in the fiscal affairs office workload and the Department's financial stress, Bulgarella finally concluded that they simply did not need a Financial Officer III.  Bulgarella aff., ¶ 14.

Bulgarella consulted with Chestnut about the job elimination.  Bulgarella depo. 74-77.  She explained to Chestnut:

> that for at least six months prior to Melanie's departure for her substance abuse problem that I had been considering elimination of this position, that the work had been distributed amongst the staff, myself included, and that I thought the components of her job could be done without Melanie there.

Bulgarella depo. 77.  Chestnut asked her how plaintiff's duties had evolved in the last few years and what impact the elimination of plaintiff's position would have

8

on the ability of the fiscal affairs office to perform its responsibilities.  Chestnut depo. 16-18.  After some discussion, Chestnut supported Bulgarella's decision to eliminate plaintiff's position.  Chestnut depo. 17.

When plaintiff was released to return to work from her rehabilitation program, Bulgarella, Marty Box, UAHSF's Human Resources Director, and Kelly Mayer, from UAB Employee Relations, met with her.  Plaintiff depo. 206.  Mayer explained the requirements that plaintiff had to meet to return to work with UAB or UAHSF following drug rehabilitation, including the procedures plaintiff would need to follow for drug screens.  Plaintiff depo. 207.  At the conclusion of this discussion, plaintiff understood that she would need to submit to regular screens and that she needed to submit to those screens to continue any employment or eligibility for employment at UAB or UAHSF.[5]  Plaintiff depo. 207-08.

Bulgarella then told plaintiff the Department had eliminated her position and outlined the reasons for the decision.  Plaintiff depo. 208, *see* Exh. 12 to plaintiff depo.  Plaintiff was encouraged to apply for other positions with UAHSF or UAB.  Plaintiff depo. 209-210; Exh. 12 to plaintiff depo.  Additionally, defendants gave plaintiff four months severance pay, which was two months more than UAB's policy provided.  Exh. 12 to plaintiff depo.; Bulgarella aff., ¶ 16.

---

[5]Plaintiff submitted to those drug screens for a few months, but once she obtained a position outside of UAB or UAHSF, she stopped.  Plaintiff depo. 48-49.

In January 2003, while plaintiff was on leave, one of plaintiff's subordinates, Sharon Tucker, told Bulgarella that plaintiff told her that plaintiff was having a relationship with one of the faculty members.  Bulgarella depo. 53-54.  Bulgarella reported the rumor to Chestnut.  Bulgarella depo. 55; Exh. 12 to Bulgarella depo.; Chestnut depo. 9-10.  Chestnut and Bulgarella were concerned that such a relationship could pose an operational concern because plaintiff worked on accounts that affected the faculty member and had confidential financial information to which the faculty member was not privy.  Bulgarella aff., ¶ 18; Chestnut depo. 10-11.  Plaintiff agreed that a financial officer's relationship with a faculty member could reasonably concern the department chair.  Plaintiff depo. 286-288.  After obtaining advice about whether such a relationship itself would pose a problem under current policies, Chestnut concluded that he was not sure. Chestnut depo. 37.  Accordingly, Chestnut met with the faculty member and asked if he was having an affair with plaintiff.  Chestnut depo. 13, 37.  The faculty member emphatically denied any relationship with plaintiff and Chestnut believed him.  Chestnut depo. 37.  Chestnut reported this information to Bulgarella and they discussed that she would speak with plaintiff about the issue when she returned to work.  Chestnut depo. 15; Bulgarella depo. 95.  Bulgarella never did so.  Bulgarella depo. 95.

### III.  Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,*  477 U.S. at 322-23.  The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of  the pleadings or filings which it believes demonstrates the absence of a genuine issues of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

11

475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine

issue for trial."  Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also*

*Anderson*, 477 U.S. at 249.  The non-movant must "demonstrate that there is

indeed a material issue of fact precluding summary judgment." *Clark v.  Clark &*

*Coats, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court shall construe the evidence and

factual inferences arising therefrom in the light most favorable to the nonmoving

party.  See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The

substantive law will identify which facts are material and which are irrelevant.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  All "reasonable

doubts" about the facts and all justifiable inferences are resolved in favor of the

non-movant.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

However, all "doubts" need not be so resolved.  *Barnes v. Southwest Forest*

*Industries, Inc.,*  814 F.2d 607, 609 (11th Cir. 1987).

A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the

evidence is merely colorable, or is not significantly probative, summary judgment

may be granted. *Id*. at 249.  The basic issue before the court on a motion for

summary judgment is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding*, 1998

WL 758012 (S.D.Ala.); citing *Anderson*, 47 U.S. at 251-252.

### IV.  Legal Analysis

*A.  ADA/Rehabilitation Act*

Any claim under the ADA against defendant UAB is barred.  *Garrett v.

Board of Trustees*, 531 U.S. 356, 374 (2001).   However, such a claim may be

pursued under the Rehabilitation Act.  Such a claim is analyzed pursuant to the

same standard utilized by the ADA.  Similarly, the plaintiff may pursue a claim

under the ADA against UAHSF.

The burden shifting analysis in Title VII cases is equally applicable to cases

brought under the ADA.  *See Durley v. APAC, Inc.,* 236 F.3d 651, 656 (11th Cir.

2000); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226

(11th Cir. 1999). To establish a prima facie case under the ADA, the plaintiff must

show that (1) she has a disability; (2) she is a qualified individual, "which is to say,

able to perform the essential functions of the employment position that [s]he holds

... with or without reasonable accommodation;" and (3) the defendant

discriminated against her because of the disability.  *Reed v. Heil Co.*, 206 F.3d

1055, 1061 (11th Cir. 2000); *citing Hillburn v. Murata Electronics North America,

Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999); *see also Swain v. Hillsborough County

School Board*, 146 F.3d 855, 857 (11th  Cir. 1998).  In addition, the plaintiff must

show that the employer had either actual or constructive knowledge of the

disability or considered the employee to be disabled.  *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996).

The defendant argues that the plaintiff is unable to establish that she is "disabled" as that term is defined by the ADA.  Without meeting such definition, the plaintiff is necessarily precluded from establishing that she was wrongfully terminated due to a disability in violation of the ADA.  Not every impairment constitutes a disability under the ADA.  *See Hilburn v. Murata Elecs., N.A., Inc.*, 181 F.3d 1220, 1226 (11th Cir.1999).

The plaintiff argues both that alcoholism is a disability and that the defendants considered Hubka to be incapable of taking care of herself.  However, plaintiff offers no evidence to demonstrate that she was disabled by alcoholism, or that the defendants considered her to be incapable of caring for herself.  Rather, the plaintiff's own testimony is that her only limitation was her ability to sleep, which has been helped by sleeping pills.  Plaintiff depo. 306-308.  She adds that, in spite of this problem, she is able to work.  Plaintiff depo. 308-309.

Even if the plaintiff could establish a prima facie case under the ADA or the Rehabilitation Act, the defendant has put forth a legitimate, non-discriminatory reason for her "termination," namely that her position was eliminated.  The plaintiff admitted in her deposition that she was not doing her job long before she went into EAP.  Plaintiff depo. 85-86, 90, 93-94, 112, 118.  Her duties were performed by others and the defendant learned it did not need to fill plaintiff's

14

position.  Bulgarella aff., ¶ 3, 14; Plaintiff depo. 94, 154, Exh. 4 to plaintiff depo. In the plaintiff's own words, upon being told her position was eliminated, "I was thinking thank God you didn't fire me, you know, because at that time in my life, at that point, I felt like I deserved to be fired because of my behavior and the things I had done."  Plaintiff depo. 208-209.

Therefore, the burden shifts back to the plaintiff to show that the defendant's legitimate reason, that it did not need the position filled, is really a pretext for discrimination.  *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  The plaintiff offers no such evidence.  The plaintiff argues only that the timing of the announcement that the job was eliminated is "questionable enough to create a question of liability."  Plaintiff's consolidated response, at 11.  This is insufficient to demonstrate that the elimination of the plaintiff's position was a pretextual means by which to discriminate against her.

The ADA claim against UAHSF is due to be dismissed because there is no evidence that the plaintiff suffered from any "disability" as that term is defined by the statute.  Even if plaintiff satisfied the prima facie case under the ADA, the defendant had a legitimate, non-discriminatory reason for terminating her, which the plaintiff has offered no evidence to rebut.  For the same reasons, the plaintiff's Rehabilitation Act claim is due to be dismissed against defendant UAB.

*B.  Title VII*

This claim may only be pursued against the plaintiff's employers, defendants UAB and UAHSF.  The plaintiff claims she was discriminated against based on her sex.  She alleges that she was terminated for sleeping with a male faculty member while that the faculty member in question is still employed.  Even if the court could assume the plaintiff and the male faculty member in question were similarly situated employees, the defendants offered a legitimate, non-discriminatory reason for terminating the plaintiff, namely after her failure to perform her job responsibilities for more than six months, the defendants discovered they did not need her to do her job.

To establish a prima facie case of sex discrimination, the plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected classification more favorably.  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000), citing *Holifield v. Reno,* 115 F.3d 1555, 1562-63 (11th Cir.1997).

The plaintiff has failed to show that a similarly situated employee outside her protected class was treated more favorably.  The gentleman with whom the plaintiff engaged in an affair is not a suitable comparator, because the plaintiff was not a faculty member.  Rather, she was an employee.  The plaintiff also cannot

show that she was replaced as the defendant has evidence that her position was never filled.  Bulgarella affidavit, ¶ 20.

Even if the plaintiff could establish a prima facie case, the plaintiff must show "not merely that the defendant's employment decisions were mistaken, but that they were indeed motivated by sex."  *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000), citing *Alexander v. Fulton Co.,* 207 F.3d 1303, 1309 (11th Cir.2000).  There is simply no evidence in the record that the elimination of plaintiff's position was based on her gender, or her affair.  Rather, the sole evidence before the court, which the plaintiff has failed to rebut, is that the defendants discovered they did not need anybody to perform the job plaintiff had and therefore eliminated the position.  The fact that they learned this due to plaintiff's numerous indiscretions is not material.  *See e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [gender]").

Plaintiff's argument that her salary was only a negligible portion on the Department's deficit is not evidence which demonstrates that the defendants' proffered non-discriminatory, legitimate reason is false.  Rather, it adds credence to the defendants' position that, having discovered they did not need plaintiff's position filled, they eliminated it.  The fact that the plaintiff's position was already in the budget is not evidence that this reason is false.  The plaintiff cannot

17

demonstrate pretext merely by questioning the wisdom of the defendants' decision. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir.2000).   This court's place is not to second guess the decisions of employers, as long as those decisions are not based on discriminatory reasons.  *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1244 (11th Cir.2001). *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997) ("federal courts do not sit to second-guess the business judgment of employers").

As the plaintiff cannot proceed on her claims against the individual defendants under Title VII, any employment gender discrimination claims the plaintiff is stating against the individual defendants are due to be dismissed.[6]

*C. §1983*

Plaintiff also makes § 1983 allegations against the individual defendants. Defendants argue, as public officials (UAB employees), they have qualified immunity for discretionary functions, such as the elimination of plaintiff's position.  The plaintiff states that "the law is well-settled that a public official/public employee may not retaliated (sic) against a disabled employee or a

---

[6]The court notes plaintiff's sole argument on this issue consists of one half of the second to last sentence in her Consolidated Response, that "Title VII placed the same officials on notice that race and gender discrimination was clearly prohibited as a matter of law."  Plaintiff's Consolidated Response, at 12.   Even if the plaintiff successfully plead a claim under §1983 for race and gender discrimination, the court finds any such claim abandoned by the plaintiff's failure to address it in her consolidated response to summary judgment.  *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1284 (11th Cir.2003); *see also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir.2001).

person perceived to be disabled."  However, the plaintiff may not maintain this action "in lieu of – or in addition to – a Rehabilitation Act or ADA cause of action if the only alleged deprivation is the employee's rights created by the Rehabilitation Act and the ADA."  *Holbrook v. City of Alpharetta, Georgia*, 112 F.3d 1522, 1531 (11th Cir.1997).  As this is the sole grounds alleged by the plaintiff, these claims must be dismissed as well.

### V. Conclusion

Having considered the foregoing, and being of the opinion that the defendants' motions for summary judgment are due to be granted on all of the plaintiff's claims, the court shall grant said motions by separate Order.

**DONE** and **ORDERED** this the 19th day of January, 2005.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE